UNITED STATES DISTRCT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

CRESTA CAPITAL STRATEGIES, LLC,

                Plaintiff,

    - against –

APPROVED CASH ADVANCE CENTERS, LLC,

                Defendant.

-------------------------------------------------------------------x

Case No.: 08-2399
(Kaplan, J.)

**AFFIDAVIT OF**
**JEFFREY A. MILLER, ESQ.**

STATE OF NEW YORK    )
                         ) ss:
COUNTY OF NASSAU    )

    JEFFREY A. MILLER, being duly sworn, deposes and states:

    1.    I am a partner with the law firm Westerman Ball Ederer Miller & Sharfstein, LLP, counsel for plaintiff Cresta Capital Strategies, LLC ("Cresta"). As such, I am fully knowledgeable about the facts stated herein. I respectfully submit this affidavit in support of Cresta's motion to disqualify John Anderson, Esq. ("Anderson"), H. Wayne Grant, Esq. ("Grant"), and Grant, Konvalinka & Harrison, P.C. ("GKH") from representing defendant Approved Cash Advance Centers, LLC ("ACA") in this action.

    2.    As set forth more fully in the accompanying memorandum of law, Anderson, Grant, and GKH must be disqualified from representing defendant in this litigation pursuant to the "advocate witness rule." *See* DR 5-102, 22 NYCRR 1200.21. By their own admission, Anderson and Grant are unquestionably key witnesses in this case. They, along with their law firm, should be disqualified.

3.    This action arises out of an Investment Banking Agreement (the "Agreement", attached hereto as Exhibit "A") between Cresta and defendant, pursuant to which ACA retained Cresta to procure financing and perform investment banking services for ACA in exchange for compensation. *See also* Affidavit of Abraham Mirman ("Mirman Aff.") at ¶ 2.

4.    Pursuant to the Agreement, Cresta facilitated and procured for ACA an agreement whereby Credit Suisse Securities (USA) LLC ("Credit Suisse") agreed to provide to ACA a $30,000,000 senior first lien facility. *See* Mirman Aff. at ¶ 3.

5.    However, ACA terminated the agreement with Credit Suisse and did not close on the transaction. *See* Mirman Aff. at ¶ 4. Under the express terms of the Agreement, Cresta was and is entitled to a termination fee and other compensation. *See, e.g.,* Agreement at § 4.    ACA, however, refused to pay. Cresta was therefore forced to bring this lawsuit to recover the termination fee and expenses owed by ACA to Cresta under the Agreement. *See* Mirman Aff. at ¶ 4.

6.    Anderson represented ACA in the negotiations leading up to the Agreement, during Cresta's performance of the Agreement, and during and after ACA's breach of the Agreement. He personally dealt with Cresta throughout this time on matters going to the heart of this action. *See* Mirman Aff. at ¶ 5.

7.    Anderson heavily participated in the drafting of the Agreement. **In fact, his handwritten notes appear on several pages of the Agreement**. *See* Mirman Aff. at ¶ 6; Agreement at pp. 1-3. **This handwritten language by Anderson will likely be an important issue in the case**. Anderson's handwriting relates to ACA's purported defense based on the so-called "Morgan Keegan Agreement", which concerned a

2

potential sale of the membership interests in ACA.  ACA is apparently relying on Anderson's handwritten insertions to avoid its contractual obligations to Cresta.  **Indeed, ACA has recently served a set of interrogatories (Exhibit "B" hereto), two of which specifically ask for Cresta's interpretation of Anderson's own handwriting on the Agreement**.  *See* Exhibit "B" at interrogatories 4 and 5.[1]

8.    Thus, since ACA itself is making an issue of Anderson's handwritten insertions into the Agreement, and how such language should be construed, Anderson is unquestionably a vital witness on these issues.

9.    Anderson and his firm continued their involvement long after he added his handwritten language to the Agreement.  After the Agreement was executed, Abraham Mirman of Cresta engaged in extensive email correspondence and other communications with both Anderson and Grant concerning the Agreement.  *See* Mirman Aff. at ¶ 7. There were more than a thousand emails between Cresta and Anderson's firm – with attachments, this amounted to several thousands of pages of documents exchanged.  *Id.*

10.    Anderson and Grant also were in frequent communication with Credit Suisse, and have important knowledge about the proposed Credit Suisse loan transaction and ACA's termination of that proposed deal.  *See* Mirman Aff. at ¶ 8.

11.    All of these issues are central to this lawsuit.  In defending against Cresta's claims in this action, ACA has taken the position that Cresta is not entitled to its termination fee based on ACA's incorrect interpretation of the Agreement – including the construction of Anderson's very own handwritten insertions – and the intent of the parties

---

[1]    ACA's interrogatories are improper because, among other reasons, they are clearly beyond the scope of permissible interrogatories allowed by Local Civil Rule 33.3.  Nevertheless, the interrogatories further demonstrate why Anderson will be a key witness in this action and should therefore be disqualified as attorney for ACA.

in negotiating and entering into the Agreement. These are matters that Anderson and Grant were directly involved with. They will be key witnesses with respect to these issues.

12.    Anderson and Grant will need to be deposed and questioned about, among other topics, the terms of the Agreement, the meaning of those terms, whether ACA violated those terms, their dealings with Cresta, and their dealings with Credit Suisse. These are the core issues in the case.

13.    **Significantly, ACA itself admits that Anderson is a key witness in this case**. In its Rule 26(a) disclosures, ACA identified Anderson as an individual having knowledge of relevant and discoverable information. *See* Exhibit "C" (at Exhibit "A" thereto). Specifically, ACA admitted that Anderson "was a member of his law firm (GKH) that acted as legal counsel in several matters that related to the business of ACA. He was personally involved in meetings and discussions with representatives of Cresta and those of Credit Suisse." *Id.* This admission by ACA – that Anderson is a material witness – mandates disqualification.

14.    **Moreover, Anderson has himself admitted to the Court that he is, in effect, the principal of ACA**.    On June 30, 2008, we appeared for a settlement conference before Magistrate Judge Peck, who had ordered counsel to appear with our respective clients. In violation of that directive, no formal principal of ACA appeared. (This is the subject of a pending motion for sanctions against ACA for its disregard of

4

Magistrate Judge Peck's order.[2]) Yet, at that conference, **<u>Anderson identified himself</u> <u>as the "client"</u>**. This says it all.

15.    Respectfully, since Anderson and Grant are important witnesses in this litigation, they must be disqualified from representing ACA, and their law firm, GKH, must be disqualified as well. For the legal points and authorities in support of the requested relief, the Court is respectfully referred to the accompanying memorandum of law.

**WHEREFORE**, on behalf of Cresta, I respectfully request that the Court grant Cresta's motion in its entirety, and grant Cresta such other and further relief as the Court deems just, proper and equitable.

JEFFREY A. MILLER

Sworn to before me this
15th day of July, 2008

Notary Public

116796
FLORENCE JEAN-JOSEPH
Notary Public, State of New York
No. 41-5010171
Qualified in Queens County
Commission Expires 9/18/2009

---

[2]  Cresta complied with Magistrate Judge Peck's order.  In fact, <u>three</u> representatives of Cresta appeared at the settlement conference.  The conference, however, was not productive because no formal principal of ACA showed up.

**EXHIBIT "A"**

6/4/07

## INVESTMENT BANKING AGREEMENT

THIS AGREEMENT (the "Agreement") dated as of June 1, 2007 by and between Approved Cash Advance Centers, LLC with its principal address 2253 Chambliss Avenue Ste 300 Cleveland, TN 37311 (collectively, the "Company") and Cresta Capital Strategies, LLC, with its principal address at 1175 Walt Whitman Road Ste 100 Melville, NY 11747 (the "Banker").

### W I T N E S S E T H:

WHEREAS, the Company desires to retain the Banker and the Banker desires to be retained by the Company pursuant to the terms and conditions hereinafter set forth:

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants herein contained, it is hereby agreed as follows:

SECTION 1. Retention.

(a)    The Company hereby retains the Banker to perform the services set forth in Section 1 (b) below during the one year period commencing on the date hereof. This Exclusive Agreement shall automatically renew for additional thirty-days unless terminated in writing not less than thirty (30) days prior to the original or any subsequent expiration date (the thirty day period and any renewals thereof, the "Term"). The Banker hereby accepts such retention and shall perform for the Company the duties described herein, faithfully and to the best of its ability. During the Term, the Banker shall report directly to the ~~President of the Company~~ or to any other senior officer designated in writing by the ~~President of the Company.~~

(b)    The Banker shall serve as the investment banker to the Company and render such advice and services to the Company as may be reasonably requested by the Company concerning equity and/or debt financings, strategic planning, merger and acquisition possibilities and business development activities including, without limitation, the following:

(i)    Study and review of the business, operations, and historical financial performance of the Company (based upon management's forecast of financial performance) so as to enable the Banker to provide advice to the Company;

(ii)    Assist the Company in attempting to formulate the best strategy to meet the Company's working capital and capital resource needs;

(iii)    Assist in the formulation of the terms and structure of any reasonable proposed business combination transaction involving the Company, including without limitation, any merger or consolidation, sale of assets, or sale or exchange of stock (a "Business Combination");

(iv)    Assist in the presentation to the Board of Directors of the Company of any proposed transaction;

6/4/07

(v)    Advise the Company in the preparation of press releases and other communications with the financial and investment communities;

(vi)    Assist the Company in its efforts to have its securities listed on a nationally listed stock exchange or the NASDAQ National Market or Small Cap systems by analyzing the quantitative and qualitative requirements as required by any exchange or medium, including but not limited to (A) net tangible assets, market capitalization, shareholders equity or net income, (B) public float of the Company's common stock, (C) market-makers, (D) shareholders, (E) corporate governance requirements, (F) independent directors, (G) audit and compensation committees and (H) assist, where necessary, in an effort to enable the Company to obtain an exchange listing and to be in a position to remain continuously listed thereafter; and

(vii)    Introduce the Company to potential lenders of funds as well as to potential investors (whether such investment is in the form of debt and/or equity financing or some combination thereof).

SECTION 2. Compensation.

(a)    If the Banker arranges or introduces the Company to any source (each individually, the "Banker Source") who provides an equity financing, including any securities convertible into equity (the "Equity Financing"), and the Company closes a transaction with such provider, the Company shall pay the Banker at closing (i) commissions in cash in an amount equal to ten percent (10%) of the total gross cash proceeds of the Equity Financing (ii) a non-accountable expense allowance in cash equal to three percent (3%) of the total gross cash proceeds of the Equity Financing and (iii) warrants to purchase such number of shares of the Company's common stock (the "Common Stock") as shall equal ten percent (10%) of the shares of the Common Stock issued at closing or to be issued thereafter upon conversion of any convertible securities and/or exercise of any derivative securities (including, without limitation, warrants or options) issued in the Equity Financing on a post-financing, fully-diluted basis at an exercise price per share equal to the lowest per share price paid or payable on conversion by the Banker Source or at the valuation of Investor and exercisable, in whole or in part, during the five (5) year period commencing on the issuance date of such warrants (the "Warrant Fee").

(b)    If the Banker introduces the Company to any Banker Source for a Business Combination or facilitates or helps bring about a Business Combination with a public or private company, which the Company closes, the Company shall pay the Banker at closing (i) banking fees in cash in an amount equal to ten percent (10%) of the total gross cash proceeds and all other non-cash consideration of the Business Combination paid or received by the Company, (ii) a non-accountable expense allowance in cash equal to three percent (3%) of the total gross cash proceeds and all other non-cash consideration of the Business Combination paid or received by the Company, and (iii) a Warrant Fee equal to ten percent (10%) of the shares of the Common Stock issued at closing or to be issued upon conversion of any convertible securities and/or exercise of any derivative securities (including, without limitation, warrants or options) issued in the Business Combination. The Warrant Fee, at the option of the Banker, may be exercised in cash or by an exchange of the "value" thereof as a "cashless exercise." For this purpose, the "value" of the

2

6/4/07

Warrant Fee with respect to the right to acquire one share of common stock shall be the amount equal to the closing bid price of the Common Stock on the date of exercise less the exercise price. In the event the Company is not the surviving entity of the Business Combination, then the Warrant Fee shall be issued and convertible into the common stock of such surviving entity. In the event such Banker Source exercises any warrants and/or options which were issued as part of said financing, Banker shall be paid a fee of five percent (5%) of the total gross proceeds of such warrant and/or option exercise.

(c)    If the Banker introduces the Company to any Banker Source who provide any of the following capital related instruments for the Company (each a "Transaction"), the Company shall pay the Banker a cash fee at closing based upon the total face value of the Transaction in accordance with the following schedule: (i) an amount equal to six percent (6%) of any and all consideration received by the Company in any debt financing not convertible into equity and a non-accountable expense allowance in an amount equal to one percent (1%) of any and all consideration received by the Company in such debt financing ("Senior Financing"); (ii) three percent (3%) of any revolving credit line; (iii) two percent (2%) of any credit enhancement instrument, including on an insured or guaranteed basis; and (iv) six percent (6%) of any revenue-producing contract, fee-sharing arrangement, licensing, royalty-or similar agreement.

(d)    As the exclusive banker we (A) shall have the exclusive right to choose the managing underwriter in any public offering of securities made by the Company or its shareholders and (B) thereafter, in the event the Company closes any Fee Transaction with, or with a party introduced by, a third-party agent, but not with a Banker Source, that is entitled to earn a fee in connection with the Fee Transaction (and therefore, such third party agents are not included on Schedule A), the Company may enter into such transaction provided, however, that Banker shall be entitled to receive an amount equal to the greater of (x) one half (1/2) of the total of any and all fees paid to such third-party agent or (y) one half (1/2) of the fee Banker would have earned if Banker had introduced the Fee Transaction through a Banker Source. The obligations of the Company under section 2(f) shall survive for a period of thirty (3) years from the date of this Agreement.

*All terms of this agreement are subject the same referenced Morgan Keegan agreement.*

(e)    Each Banker Source introduced to the Company under Section 2 (c) or the date of this Agreement shall be listed in Schedule A annexed hereto and made a part hereof. Subsequent to the date of this Agreement and immediately upon the Banker's introduction of a Banker Source to the Company, the Banker shall amend Schedule A to include each additional Banker Source.

(f)    The obligation of the Company to compensate Banker for any Fee Transaction, with a Banker Source, shall survive for a period of three (3) years from the date of termination of this Agreement for each such Fee Transaction.

(g)    There shall be **NO retainer** in this transaction. Any and all fees shall be due based on **A Success Basis.**

(h) Except as otherwise provided for herein:

3

6/4/07

      (i)    All fees due to the Banker hereunder shall have no offsets, are non-refundable, non-cancelable and shall be free and clear of any and all encumbrances.

      (ii)    All cash fees due the Banker hereunder shall be paid to the Banker immediately upon closing of any Fee Transaction by wire transfer of immediately available funds from the proceeds of the Fee Transaction, either directly or from the formal or informal escrow arrangement established for the Fee Transaction by the agent holding such funds (collectively, the "Closing Agent"), pursuant to the written wire transfer instructions of the Banker to the Closing Agent. The Closing Agent shall be the attorneys for the Banker.

      (iii)    All securities fees due the Banker hereunder shall be made via DTC or the DWAC system if eligible for such system, or by certificates issued by the transfer agent for the Company or the Company, as applicable, and shall be delivered to the Banker by the Closing Agent immediately upon closing of any Fee Transaction.

      (iv)    All securities fees due the Banker hereunder shall be duly issued, fully-paid (exclusive of warrants or options) and non-assessable and shall be in the same form, with the same terms and conditions as the securities provided to the Company pursuant to any Fee Transaction.

      (v)    For the purposes of this Agreement, "Registrable Securities" shall mean (i) all shares of Common Stock of the Company paid or payable to the Banker under this Agreement, (ii) all shares of Common Stock into which convertible securities issued or issuable to the Banker under this Agreement are convertible and (iii) all shares of common stock into which derivative securities (including, without limitation, warrants and options) issued or issuable to the Banker are exercisable. The Company hereby grants to the Banker "customary piggyback registration rights" and shall register all of the Registrable Securities on any registration statement it files with the Securities and Exchange Commission relating to its securities (excluding registration statements on Form S-8) and in compliance with any and all federal and state securities laws, in the name(s) of and to the account(s) designated by the Banker. The Company agrees to pay all costs associated with registering the Registrable Securities for resale. In order to effectuate the foregoing provisions, at the Banker's request, either simultaneously herewith or at anytime hereafter, the Company shall execute and deliver to the Banker a Registration Rights Agreement reflecting the foregoing provisions.

      (i)    The Company shall authorize and direct the Closing Agent to distribute directly or from escrow any and all fees due the Banker hereunder (or the Company and the Banker, if required to do so, shall establish an escrow account in accordance with NASD rules). The Company agrees that such fees and the manner of payment and delivery as herein provided shall be included in the documentation of any Fee Transaction. The Banker is hereby authorized to notify the Closing Agent, on behalf of the Company and as its agent, to make all payments required hereunder directly to the Banker. In order to effectuate the foregoing provisions, at the Banker's request, either simultaneously herewith or anytime hereafter, the Company shall execute and deliver (i) a Power of Attorney that gives the Banker the right to ensure payment to Banker of any and all fees due hereunder and (ii) the Irrevocable Disbursement Instructions annexed hereto as Schedule B

6/4/07

that require the Closing Agent to pay any and all fees due the Banker hereunder before it makes any disbursement to the Company.

SECTION 3.  Expenses. The Company shall reimburse the Banker for any out-of-pocket expenses in excess of $500 per expense, incurred by the Banker.  Any such expenses in excess of $500 shall require the prior written approval of the Company and shall be evidenced by written documentation prior to reimbursement.  Reimbursement by the Company to the Banker will be made within thirty (30) days of the Company's receipt of said documentation.

SECTION 4.  Termination Fee. Provided that the Banker is proceeding in good faith at all times, the Company warrants that it will not terminate this Agreement for any reason unless such termination is made after compliance with Section 5 of this Agreement.  The Company agrees that in the event it elects to terminate, cancel or rescind any agreements, term sheets or letters of intent pursuant to any Equity Financing, Business Combination , Transaction or Other Transaction the Company enters into that was facilitated by the Banker, excluding any such cancellation that is made pursuant to pertinent "out clauses" or closing conditions of the  respective documents regarding such transactions that allow the Company to terminate such transaction without incurring any liability or obligation to any other party, then the Company shall immediately pay to the Banker a termination fee equal to fifty percent (50%) of the total fees that would have been paid to the Banker had the transaction been effected.

SECTION 5.  Termination.   This Agreement and the Banker's engagement hereunder shall not be terminated by Company under any circumstances nor for any reason whatsoever, unless all compensation due to Banker pursuant to Section 2 above has been distributed to the Banker from the Closing Agent for all Fee Transactions entered into or closed prior to termination.  Sections 2, 3, 4, 6, 7 and 8 shall survive any termination of this Agreement.

SECTION 6.  Confidential Information.  The Banker agrees that during and after the Term, it will keep in strictest confidence, and will not disclose or make accessible to any other person without the written consent of the Company, the Company's products, services and technology, both current and under development, promotion and marketing programs, lists, trade secrets and other confidential and proprietary business information of the Company or any of its clients and third parties including, without limitation, Proprietary Information (as defined in Section 7) (all of the foregoing is referred to herein as the "Confidential Information").  The Banker agrees (a) not to use any such Confidential Information for itself or others, except in connection with the performance of its duties hereunder; and (b) not to take any such material or reproductions thereof from the Company's facilities at any time during the Term except, in each case, as required in connection with the Banker's duties hereunder.

Notwithstanding the foregoing, the parties agree that the Banker is free to use (a) information in the public domain not as a result of a breach of this Agreement, (b) information lawfully received form a third party who had the right to disclose such information and (c) the Banker's own independent skill, knowledge, know-how and experience to whatever extent and in whatever way he wishes, in each case consistent with his obligations as the Banker and that, at all times, the Banker is free to conduct any research relating to the Company's business.

5

6/4/07

SECTION 7.  Ownership of Proprietary Information.  The Banker agrees that all information that has been created, discovered or developed by the Company, its subsidiaries, affiliates, licensors, licensees, successors or assigns (collectively, the "Affiliates") (including, without limitation, information relating to the development of the Company's business created, discovered, developed by the Company or any of its affiliates during the Term, and information relating to the Company's customers, suppliers, Bankers, and licensees) and/or in which property rights have been assigned or otherwise conveyed to the Company or the Affiliates, shall be the sole property of the Company or the Affiliates, as applicable, and the Company or the Affiliates, as the case may be, shall be the sole owner of all patents, copyrights and other rights in connection therewith, including without limitation the right to make application for statutory protection.  All the aforementioned information is hereinafter called "Proprietary Information."  By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, discoveries, structures, inventions, designs, ideas, works of authorship, copyrightable works, trademarks, copyrights, formulas, improvements, inventions, product concepts, techniques, marketing plans, merger and acquisition targets, strategies, forecasts, blueprints, sketches, records, notes, devices, drawings, customer lists, patent applications, continuation applications, continuation-in-part applications, file wrapper continuation applications and divisional applications and information about the Company's Affiliates, its employees and/or Bankers (including, without limitation, the compensation, job responsibility and job performance of such employees and/or Bankers).

All original content, proprietary information, trademarks, copyrights, patents or other intellectual property created by the Banker that does not include any specific information relative to the Company's proprietary information, shall be the sole and exclusive property of the Banker.

SECTION 8.  Indemnification. The Company represents that all materials provided or to be provided to the Banker or any third party regarding the Company's financial affairs or operations are and shall be truthful and accurate and in compliance with any and all applicable federal and state securities laws. The Company agrees to indemnify and hold harmless the Banker and its Bankers, professionals, lawyers, consultants and affiliates, their respective directors, officers, shareholders, partners, members, managers, agents and employees and each other person, if any, controlling the Banker or any of its affiliates to the full extent lawful, from and against all losses, claims, damages, liabilities and expenses incurred by them (including reasonable attorneys' fees and disbursements) that result from actions taken or omitted to be taken (including any untrue statements made or any statement omitted to be made) by the Company, its agents or employees which relate to the scope of this Agreement and the performance of the services by the Banker contemplated hereunder.  The Banker will indemnify and hold harmless the Company and the respective directors, officers, agents, affiliates and employees of the Company from and against all losses, claims damages, liabilities and expenses that result from bad faith, gross negligence or unauthorized representations of the Banker.  In no event shall the Banker be responsible or liable hereunder for an amount in excess of the compensation received by it pursuant to this Agreement. Each person or entity seeking indemnification hereunder shall promptly notify the Company, or the Banker, as applicable, of any loss, claim, damage or expense for which the Company or the Banker, as applicable, may become liable pursuant to this Section 8. No party shall pay, settle or acknowledge liability under any such claim without consent of the party liable for indemnification, and shall permit the Company or the Banker, as applicable, a reasonable opportunity to cure any underlying problem or to mitigate actual or potential damages.  The scope of this indemnification

6/4/07

between the Banker and the Company shall be limited to, and pertain only to certain transactions contemplated or entered into pursuant to this Agreement.

The Company or the Banker, as applicable, shall have the opportunity to defend any claim for which it may be liable hereunder, provided it notifies the party claiming the right to indemnification in writing within fifteen (15) days of notice of the claim.

The rights stated pursuant to this Section 8 shall be in addition to any rights that the Banker, the Company, or any other person entitled to indemnification may have in common law or otherwise, including, but not limited to, any right to contribution.

SECTION 9. Notices. Any notice or other communication under this Agreement shall be in writing and shall be deemed to have been duly given: (a) upon facsimile transmission (with written transmission confirmation report) at the number designated below; (b) when delivered personally against receipt therefore; (c) one day after being sent by Federal Express or similar overnight delivery; or (d) five (5) business days after being mailed registered or certified mail, postage prepaid. The addresses for such communications shall be as set forth below  or to such other address as a party shall give by notice hereunder to the other party to this Agreement.

If to the Company:

Approved Cash Advance Centers, LLC
2253 Chambliss Ave Ste 300
Cleveland, TN 37311
Telephone: (423)478-1159
Telecopy: (423)478-5209
Attention: Mollie Tackett
Email: MTackett@approvedcashadvance.com

If to the Banker:

Cresta Capital Strategies, LLC
1175 Walt Whitman Rd Ste 100.
Melville, NY 11747
Telephone: (631)424-9009
Telecopy:  (631) 424-9010
Attention: Michael Mirman

With a copy to:

Cresta Capital Strategies, LLC
1175 Walt Whitman Rd Ste 100.
Melville, NY 11747
Telephone:  (631)424-9009
Telecopy:  (631)424-9010
Attention: Scott Boruff

SECTION 10. Status of Banker. The Banker shall be deemed to be an independent contractor and, except as expressly provided or authorized in this Agreement, shall have no

7

6/4/07

authority to act for on behalf of or represent the Company. This Agreement does not create a partnership or joint venture.

SECTION 11. Other Activities of Banker. The Company recognizes that the Banker now renders and may continue to render financial consulting and other investment banking services to other companies that may or may not conduct business and activities similar to those of the Company. The Banker shall not be required to devote its full time and attention to the performance of its duties under this Agreement, but shall devote only so much of its time and attention as it deems reasonable or necessary for such purposes.

SECTION 12. Successors and Assigns. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement and any of the rights, interests or obligations hereunder may not be assigned by either party without the prior written consent of the opposing party, which consent shall not be unreasonably withheld.

SECTION 13. Severability of Provisions. If any provision of this Agreement shall be declared by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced in whole or in part, the remaining conditions and provisions or portions thereof shall nevertheless remain in full force and effect and enforceable to the extent they are valid, legal and enforceable, and no provision shall be deemed dependent upon any other covenant or provision unless so expressed herein.

SECTION 14. Entire Agreement; Modification. This Agreement and the schedule hereto contains the entire agreement of the parties relating to the subject matter hereof, and the parties hereto and thereto have made no agreements, representations or warranties relating to the subject matter of this Agreement which are not set forth herein. No amendment or modification of this Agreement shall be valid unless made in writing and signed by each of the parties hereto.

SECTION 15. Non-Waiver. The failure of any party to insist upon the strict performance of any of the terms, conditions and provisions of this Agreement shall not be construed as a waiver or relinquishment of future compliance therewith; and the said terms, conditions and provisions shall remain in full force and effect. No waiver of any term or condition of this Agreement on the part of any party shall be effective for any purpose whatsoever unless such waiver is in writing and signed by such party.

SECTION 16. Remedies For Breach. The Banker and Company mutually agree that any breach of Sections 2, 3, 4, 5, 6, 7 or 8 of this Agreement by the Banker or the Company may cause irreparable damage to the other party and/or their affiliates, and that monetary damages alone would not be adequate and, in the event of such breach or threat of breach, the damaged party shall have, in addition to any and all remedies at law and without the posting of a bond or other security, the right to an injunction, specific performance or other equitable relief necessary to prevent or redress the violation of either party's obligations under such Sections. In the event that an actual proceeding is brought in equity to enforce such Sections, the offending party shall not urge as a defense that there is an adequate remedy at law nor shall the damaged party be prevented from seeking any other remedies that may be available to it. Judgment of the prevailing party in any dispute shall include attorneys fees and court costs.

6/4/07

SECTION 17. <u>Governing Law</u>. The parties hereto acknowledge that the transactions contemplated by this Agreement bear a reasonable relation to the state of New York. This Agreement shall be governed by, and construed and interpreted in accordance with, the internal laws of the state of New York without regard to such state's principles of conflicts of laws. The parties irrevocably and unconditionally agree that the exclusive place of jurisdiction for any action, suit or proceeding ("Actions") relating to this Agreement shall be in the state or federal courts situated in the county and state of New York. Each party irrevocably and unconditionally waives any objection it may have to the venue of any Action brought in such courts or to the convenience of the forum. Final judgment in any such Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment, a certified or true copy of which shall be conclusive evidence of the fact and the amount of any indebtedness or liability of any party therein described. Service of process in any Action by any party may be made by serving a copy of the summons and complaint, in addition to any other relevant documents, by commercial overnight courier to any other party at their address set forth in this Agreement.

SECTION 18. <u>Headings</u>. The headings of the Sections are inserted for convenience of reference only and shall not affect any interpretation of this Agreement.

SECTION 19. <u>Counterparts</u>. This Agreement may be executed in counterpart signatures, each of which shall be deemed an original, but all of which, when taken together, shall constitute one and the same instrument, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) the same with the same force and effect as if such facsimile signature page were an original thereof.

*[Signature Page Immediately Follows]*

9

6/4/07

   IN WITNESS WHEREOF, the parties hereto have executed this Agreement of thirteen (13) pages as of the day and year first written above.

      APPROVED CASH ADVANCE CENTERS, LLC

      By: _____

      CRESTA CAPITAL STRATEGIES, LLC, INC.

      By: _____
      Name:  Michael Mirman
      Title:  President

6/4/07

## SCHEDULE A

<u>Merger, Acquisition, Strategic Alliance, Lender & Investor List</u>

For: _____    By: Cresta Capital Strategies,LLC, Inc.

<u>CONFIDENTIAL</u>

6/4/07

### Schedule B

**Irrevocable Disbursement Instructions**

**Company:** _[handwritten]_
**Address:** _[handwritten]_
**Contact:** _[handwritten]_
**Telephone:** _[handwritten]_

**Investment Banker:** Cresta Capital Strategies,LLC, Inc.
**Address:**           1175 Walt Whitman Road Ste 100 Melville, NY 11747
**Contact:**           Michael Mirman
**Telephone:**         (631) 424-9009

Reference is made to the Exclusive Investment Banking Agreement (the "Agreement") of even date herewith between Cresta Capital Strategies,LLC, Inc. ("Banker") and _[handwritten]_ (the "Company"), a copy of which is annexed hereto. All capitalized terms used herein shall have the meanings ascribed to them in the Agreement.

This Irrevocable Disbursement Instructions ("Instructions Instrument") confirms the Company's agreement, instructions and authority to direct the Closing Agent, to remit funds or securities to Banker for any and all fees due to Banker directly from the closing proceeds of any Fee Transaction, pursuant to the terms and conditions of the Agreement.

This Irrevocable Payment Authorization has been executed in connection with a proposed transaction facilitated by Banker for the benefit of the Company. The Company further agrees, confirms and directs the Closing Agent as follows:

> 1) All of the fees and securities payable and paid to Banker shall be made without offsets, claims or encumbrances and shall be paid in certified U.S. funds and be remitted to Banker upon the closing of any Business Combination, Senior Financing, Equity Financing or other transaction pursuant to the Agreement. THE CLOSING AGENT SHALL NOT DISBURSE ANY FUNDS TO ANY PERSON UNLESS THE BANKER IS PAID AT OR PRIOR TO ANY SUCH DISBURSEMENT.

> 2) This instrument confirms and directs the Closing Agent to list and include Banker in any and all required closing documentation and disbursement memoranda, as deemed necessary to effectuate the terms of the Agreement and this Instructions Letter.

> 3) This Instructions Authorization is effective for a period of three (3) years from the date of the Agreement.

> 4) All remittances made to Banker shall be directed as set forth in the Schedule below.

6/4/07

The Company hereby agrees and confirms this Irrevocable Disbursement Instructions is approved by the Company and sets it hand upon this _____ day of _____, 2007.

     **Company:**

                                  **Corporate Seal or Notary Public**

_____

Print Name & Title
_____

Authorized Signatory

Schedule of
**Remittance Information for Company to Banker**


**Via Federal Wire Transfer:**

Name:  Cresta Capital Strategies,LLC, Inc.

Bank Name:   Commerce Bank-East Northport

Bank Address: 517 Larkfield Road
                  East Northport, NY 11731

Account #:    7922250746

ABA/Routing: 026013673

**For securities that cannot be wired:**

Name:      Cresta Capital Strategies,LLC, Inc.

Address:    1175 Walt Whitman Road Suite 100
            Melville,NY 11747
            Phone 631-424-9009

13

**EXHIBIT "B"**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

CRESTA CAPITAL STRATEGIES, LLC,

                        Plaintiff,       ·            Case No. 08 CIV 2399

                                              (Kaplan, J.)

       -against-

APPROVED CASH ADVANCE
CENTERS, LLC,

                        Defendant.

------------------------------------------------------X

## DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

      Comes the Defendant, Approved Cash Advance Centers, LLC, pursuant to Rule 33 of the <u>Federal Rules of Civil Procedure</u> and propounds the following interrogatories to the Plaintiff.

### PRELIMINARY STATEMENT

      **I. Definitions.** As used in these interrogatories, the terms listed below shall be defined as follows:

      (A) "Plaintiff" refers to Cresta Capital Strategies, LLC.

      (B) "Defendant" refers to Approved Cash Advance Centers, LLC.

      (C) "Person" means any natural person, firm, association, partnership, governmental agency, or other legal entity unless indicated otherwise.

      (D) "Document" means any kind of written, graphic matter or electronically stored information, however stored, produced or reproduced, of any kind or description, whether sent or received, whether originals, copies or drafts, including but not limited to: papers, books, letters, photographs and/or objects,

digitally stored, negatives and/or prints, tangible things, correspondence, telegrams, cables, telex messages, memoranda, notes, notations, work papers, transcripts, minutes, reports, drawings, blueprints, sound recordings of any type or size, recordings of telephone or other conversations, or of interviews, conferences, or other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, evaluations, contracts, agreements, journals, statistical reports, desk calendars, appointment books, diaries, lists, tabulations, summaries, any electronically stored data on magnetic or optical storage media as an "active" file or files (readable by one or more computer applications of forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during the normal operation of a computer [RAM slack] or residual data left on the hard drive after new data has overwritten some, but not all, of previously stored data; data processing, input and output, microfilms, and all other records kept by electronic, photographic or mechanical means, and things similar to any of the foregoing, however denominated.

(E) The word "or" means "and/or;" also, the word "and" means "and/or."

(F) "Written communication" means, without limitation what is defined as a "Document" above, including all drafts of any such document and those Documents intended to be delivered to a Person, but which were not actually delivered.

(G) "Oral communication" means both telephone and face to face communication with a Person.

(H) "Give the details" is a request that when appropriate, the answer should contain the details specified in subparagraphs 1 through 6 below, including the identification of all written communications, and oral communications relied upon or relevant thereto. If any such details are required in answering more than one interrogatory, repetition is not necessary, providing Plaintiff supplies complete detail in its answer to one interrogatory and in

subsequent answers refers to the page and line number at which the detail was previously supplied. Also, in lieu of describing the Document in response to subparagraph (3) & (4), Plaintiff may append a true copy(s) of such Document to its response.

(1) As to each course of action or conduct referred to, a statement of each act, event, transaction, occasion, incident or matter claimed to be a part of the course of action or conduct including:

(a) the date, time, and place where it occurred;

(b) the identity of each person participating, and a statement of who such person purported to represent; and

(c) a statement of the subject matter.

(2) As to each person referred to, a statement of his name, occupation, last known address, and last known employment.

(3) As to each "Document" mentioned or referred to in Plaintiff's answer, a statement of:

(a) its nature, i.e., contract, memorandum, report, recording, transcription, etc.;

(b) its title, if any;

(c) the date it was prepared;

(d) the identity of each person who prepared it, participated in its preparation and/or signed it;

(e) who each of the persons referred to in (d) purported to represent;

(f) its subject matter; and

(g) the name and last known address of the person who presently has custody of it.

(4) As to each "written communication," a statement of:

(a) its nature, i.e., letter, memorandum, e-mail, etc.;

(b) the date it was signed or sent;

(c) the date it was received;

(d) the identity of the person to whom it was sent;

(e) the identity of any person sent a copy;

3

(f) who each such person purported to represent;

(g) the subject matter of the communication; and

(h) the name and last known address of the person who presently has custody of it.

(5) As to each "oral communication" mentioned or referred to in the answer, a statement of:

(a) the persons involved;

(b) the date on which it occurred;

(c) where it occurred or if a telephone conversation, the place at which each person involved was located; and

(d) what was said by each person involved.

(6) The name, last known address, and official position of each and every person who supplied the person answering these interrogatories with any of the information contained in the answer to the interrogatory.

(I) Each term used herein which also is used in Plaintiff's complaint and is used in the same sense as it is used in that pleading except as the context may otherwise require.

II. Construction of Grammar and Syntax. Grammar and syntax as used in these interrogatories shall be construed and interpreted to give proper meaning and consistency to its context. By way of illustration and not by way of limitation, the singular may be construed to include the plural, the plural may be construed to include the singular and the use of any gender or tense may be construed, to include all genders and tenses.

III. Multiple Questions. Each interrogatory is intended to, and does request that each and every part and particular thereof be answered.

IV. Privilege. If any document is withheld under a claim of privilege, furnish a list which identifies each document for which a privilege is claimed, including the following information:

(1) The date of the document;

(2) The sender;

(3) The recipient;

4

4) The person to whom copies were furnished, along with their job title and position;

(5) The subject matter of the document;

(6) The basis upon which the privilege is claimed; and

(7) The paragraph of these Interrogatories to which said Documents respond.

## INTERROGATORIES

1. Provide the information of each "written communication" and each "oral communication", as set forth in their respective definitions as contained in "Definitions" above, between a representative of Plaintiff and a representative of Defendant, relating to providing any equity or debt financing for Defendant proposed or obtained on or after the date of that certain Investment Banking Agreement attached to the complaint in this matter.

**RESPONSE:**

2. Provide the information of each "written communication" and each "oral communication", as set forth in their respective definitions as contained in "Definitions" above, between a representative of Plaintiff and a representative of Credit Suisse, relating to providing any proposed equity or debt financing for Defendant which occurred on or after the date of that certain Investment Banking Agreement attached to the complaint in this matter.

**RESPONSE:**

3. Identify any "written communication" or "oral communication", as set forth in their respective definitions contained in the "Definitions" above, relating to seeking to obtain or having obtained from Credit Suisse a commitment to make a loan to the Defendant.

**RESPONSE:**

4. Describe Plaintiff's understanding of the purpose or transaction that was to be accomplished by the Morgan Keegan agreement described in the written language appearing on the first page of the Investment Banking Agreement attached to Plaintiff's complaint in this matter (appearing below Section 1(b)(iv)).

**RESPONSE:**

5. Set forth Plaintiff's understanding of the import of the written language contained below Section 1(b)(iv) and below Section 2(d) of the Investment Banking Agreement, attached to Plaintiff's complaint, as it conditioned, altered, affected or otherwise changed the rights and obligations of the parties under the Investment Banking Agreement attached to Plaintiff's complaint in this matter.

**RESPONSE:**

6. Set forth any "written communication" or "oral communication" upon which you rely to support the claim that on or about November 26, 2007, Credit Suisse was ready, willing and able to close with Defendant on a $30,000,000 senior secured first lien facility.

**RESPONSE:**

7. Set forth all "written communications" or "oral communications" that you rely upon to allege that ACA terminated the agreement with Credit Suisse, as alleged in paragraph "10" of Plaintiff's complaint.

**RESPONSE:**

8. Identify each of the "respective documents regarding" the transaction you contend existed between Credit Suisse and Defendant that is referred to in Section 4 of the Investment Banking Agreement attached

to Plaintiff's complaint and that could, if they existed, be expected to be the location for any potential "pertinent 'out clauses' or closing conditions" that would have allowed Defendant to terminate without a termination fee.

**RESPONSE:**

9. Give the details of the course of action taken by the Plaintiff to dissuade the Defendant from considering entering into a sale with a potential purchaser of the Defendant who had been identified by Morgan Keegan following learning of such potential sale.

**RESPONSE:**

10. Give the details of the course of action taken to determine the ability and date of closing on a loan by Credit Suisse to Defendant once you learned Defendant had revoked an offer to sell to the prospect brought to Defendant's attention by Morgan Keegan.

**RESPONSE:**

11. Provide the information of each "written communication" and each "oral communication", as set forth in their respective definitions as contained in "Definitions" above, between a representative of Plaintiff and a representative of Harris Financial Group, LLC relating to providing any proposed equity or debt financing for Defendant which occurred on or after the date of that certain Investment Banking Agreement attached to the complaint in this matter.

**RESPONSE:**

12. Provide the information of each "written communication" and each "oral communication", as set forth in their respective definitions as contained in "Definitions" above, between a representative of Plaintiff and a representative of Morgan Keegan relating to any sale of the Defendant

or as to providing any proposed equity or debt financing for Defendant which occurred on or after the date of that certain Investment Banking Agreement attached to the complaint in this matter.

**RESPONSE:**

13. Provide the information of each "written communication" and each "oral communication", as set forth in their respective definitions as contained in "Definitions" above, between a representative of Plaintiff and a representative of Linklaters, LLP relating to providing any proposed equity or debt financing for Defendant which occurred on or after the date of that certain Investment Banking Agreement attached to the complaint in this matter.

**RESPONSE:**

14. Provide the information of each "written communication" and each "oral communication", as set forth in their respective definitions as contained in "Definitions" above, between a representative of Plaintiff and a representative of Miller, Ellin & Co. relating to providing any proposed equity or debt financing for Defendant which occurred on or after the date of that certain Investment Banking Agreement attached to the complaint in this matter.

**RESPONSE:**

15. Provide the information of each "written communication" and each "oral communication", as set forth in their respective definitions as contained in "Definitions" above, between a representative of Plaintiff and Scott Boruff relating to providing any proposed equity or debt financing for Defendant which occurred on or after the date of that certain Investment Banking Agreement attached to the complaint in this matter.

**RESPONSE:**

Respectfully submitted,

By: *Charles J. Scheld*    *with perm.*
                                           *WTA*
Charles J. Scheld, Esq., NY BPR # 0473
The Law Offices of Seedorf & Scheld
3453 East Tremont Avenue
Bronx, New York  10465
(718) 828-8270

By: *H. Wayne Grant*    *with perm.*
                                           *WTA*
H. Wayne Grant, Esq., TN BPR # 1573
Grant, Konvalinka & Harrison, P.C.
633 Chestnut Street, Suite 900
Chattanooga, Tennessee  37450-0900

By: *William T. Alt*
William T. Alt, Esquire, TN BPR # 1587
Attorney for Defendants
300 Forest Avenue
Chattanooga, TN  37405
(423) 756-7560

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 11th day of July, 2008, a true and exact copy of the foregoing **DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF** has been served upon all parties in this case by sending same to facsimile 516.622.9212 and/or United States Mail with sufficient postage to carry the same to its destination addressed to the following:

> Daniel G. Lyons, Esq.
> Westerman Ball Ederer Miller
> & Sharfstein, LLP
> 170 Old Country Road, Suite 400
> Mineola, New York 11501

WILLIAM T. ALT

**EXHIBIT "C"**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CRESTA CAPITAL STRATEGIES, LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) **Index No. 08 CIV. 2399** |
| | ) |
| APPROVED CASH ADVANCE CENTERS, LLC, | ) |
| | ) |
|     Defendant. | ) |

### FRP 26 – Required Disclosures

### <u>Response to Rule 26(a)(1)(A)</u>

As to Rule 26(a)(1)(A), the name and address of each individual likely to have discoverable information and the subjects of the information is identified in **<u>Exhibit A</u>**, attached hereto.

### <u>Response to Rule 26(a)(1)(B)</u>

Documents Concerning the Negotiations and Communications between Cresta, Credit Suisse and ACA are furnished in electronic form and indexed in **<u>Exhibit B</u>** attached hereto and all other relevant documents are in the possession of Defendant's representatives, its attorneys or the purchaser of Approved Cash Advance Centers, LLC.

### <u>Response to Rule 26(a)(1)(C)</u>

Not applicable.

### <u>Response to Rule 26(a)(1)(D)</u>

Not applicable.

Respectfully submitted this 25th day of June, 2008.

GRANT, KONVALINKA & HARRISON, P.C.

By: _____

     H. Wayne Grant, Esq., BPR # 001573
     Ninth Floor, Republic Centre
     633 Chestnut Street
     Chattanooga, Tennessee  37450
     (423) 756-8400 (phone)
     (423) 756-6518 (fax)

## EXHIBIT A
## DEFENDANT RULE 26(a)(1)(A) REQUIRED DISCLOSURES

| Name | Discoverable Information |
|------|--------------------------|
| Toby McKenzie<br>McKenzie Management<br>3855 N. Ocoee Street, N.W., 5th Fl.<br>P. O. Box 1479<br>Cleveland, TN 37364<br>(423) 478-1159 | Mr. McKenzie is a Member of Approved Cash Advance Centers, LLC ("ACA") and has some familiarity with the various dealings between ACA and Cresta Capital Strategies, LLC ("Cresta") and Credit Suisse Securities (USA) LLC ("Credit Suisse"). |
| Marcia Gilbert<br>4160 N. Ocoee St., Ste. #8<br>Cleveland, TN 37312<br>(423) 728-0700 | Ms. Gilbert was a Member of ACA and during a period of time she acted in the capacity of Chief Financial Officer.  She is familiar with several of the discussions ACA had with Cresta and with Credit Suisse. |
| Mollie Tackett<br>3741 Sourwood Trail, NW<br>Cleveland, TN 37312 or<br>P. O. Box 2038<br>Cleveland, TN 37320<br>(423) 715-1780 (cell) | Ms. Tackett was a Member of ACA and has some knowledge as to the discussions ACA had with Cresta and with Credit Suisse. |
| David Farlett<br>1855 Executive Park Drive<br>Cleveland, TN 37312<br>(423) 478-1159 | Mr. Farlett was a Member of ACA and has some knowledge as to the discussions ACA had with Cresta and with Credit Suisse. |
| John Anderson, Esq.<br>Grant, Konvalinka & Harrison, P.C.<br>633 Chestnut Street, Suite 900<br>Chattanooga, TN 37450<br>(423) 756-8400 | Mr. Anderson was a member of his law firm that acted as legal counsel in several matters that related to the business of ACA.  He was personally involved in meetings and discussions with representatives of Cresta and those of Credit Suisse. |
| Aaron Javian, Esq.<br>Linklaters LLP<br>1345 Avenue of the Americas<br>New York, NY 10105<br>(212) 903-9159 | Mr. Javian is understood to be an attorney who acted on behalf of Credit Suisse in negotiations concerning arriving at terms to be contained in a possible Credit Agreement with lenders. |

Jens Ernberg
Credit Suisse Securities (USA) LLC
Leveraged Finance
Eleven Madison Avenue, 5th Floor
New York, NY 10010
(212) 325-2000

Mr. Ernberg represented Credit Suisse with
regard to soliciting potential lenders relating to
their interest in considering a loan to ACA and
the requirements of such a loan.

David J. Helms
Credit Suisse Securities (USA) LLC
Leveraged Finance
Eleven Madison Avenue, 5th Floor
New York, NY 10010
(212) 325-2000

Mr. Helms represented Credit Suisse in the
marketing to prospective lenders of a potential
loan to ACA and the parameters any interested
lender.

Avi Mirman
Cresta Capital Strategies, LLC
1175 Walt Whitman Road, Suite 100
Melville, NY 11747
(212) 325-2000

Mr. Mirman represented Cresta in its dealings
with ACA and is knowledgeable of the
circumstances involving the several business
options being pursued by ACA.

Chris Kern
Cresta Capital Strategies, LLC
1175 Walt Whitman Road, Suite 100
Melville, NY 11747
(212) 325-2000

Mr. Kern represented Cresta and was also
involved in dealing with ACA. He is believed
to have knowledge as to the several business
options being pursued by ACA and sought to
obtain third parties who might provide services
to ACA.

Randy McCoy
6045 Century Oaks Drive
Chattanooga, TN 37416
(423) 899-4088

Mr. McCoy attended several meetings with
Cresta's representatives and Mr. McKenzie to
discuss potential merger and ability to go
public based on the combined assets of Mr.
McCoy's businesses and those of Mr.
McKenzie.

Greg Steele
McKenzie Management
3855 N. Ocoee Street, NW, 5th Fl.
P. O. Box 1479
Cleveland, TN 37364
Home address:
215 Stonewood Drive
Cleveland, TN 37311
(423) 478-1159

Employee of Mr. McKenzie who attended
several meetings with Cresta representative
exploring the several business options being
considered by ACA.

| | |
|---|---|
| Michael Bernstein and Richard Koppel<br>Miller Ellin & Co., LLP<br>750 Lexington Avenue<br>New York, NY  10022-1200<br>(212) 750-9100 | Mr. Bernstein and Mr. Koppel are<br>representatives for the audit team conducting<br>due diligence of ACA. |

## EXHIBIT B

## DEFENDANT'S INDEX OF DOCUMENTS
## PURSUANT TO RULE 26(a)(1)(B)

1.  Letter to Aaron Javian from H. Wayne Grant dated August 29, 2007.

2.  Credit Suisse Securities (USA) LLC Summary of Proposed Term Loan, circa July, 2007.

3.  Letter to John R. Anderson from Jeffrey A. Miller, dated November 26, 2007.

4.  Letter (in form of settlement) to Avi Mirman and Jeffrey Miller from H. Wayne Grant dated December 4, 2007.

5.  Email to John Anderson from Aaron Javian dated August 24, 2007.

6.  Email to Aaron Javian from John R. Anderson dated August 1, 2007.

7.  Email between Aaron Javian and H. Wayne Grant dated November 30, 2007.

8.  Draft of $30,000,000 Credit Agreement among Approved Cash Advance Centers (Holding Company), LLC, McKenzie Financial Enterprises, LLC, The Guarantors Listed Herein, the Lenders Listed Herein and ?, dated September 6, 2007.

9.  Membership Interest Purchase Agreement as of November 9, 2007.

10. Letter of engagement with Credit Suisse Securities (USA) LLC dated July 9, 2007.

11. Letter to Keith Meyers from Ronald F. Valenta dated June 12, 2007